UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERUZA KURBANOVA,                :
                                 :CIVIL ACTION NO. 3:16-CV-1054
          Plaintiff,             :
                                 :(JUDGE CONABOY)
          v.                     :
                                 :
NANCY A. BERRYHILL,              :
Acting Commissioner of           :
Social Security,                 :
                                 :
          Defendant.             :
                                 :

_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Supplemental Security Income ("SSI") under
Title XVI of the Social Security Act ("Act").  (Doc. 1.)  Plaintiff
filed this action on June 3, 2016, after the Appeals Council denied
review of the Decision issued by Administrative Law Judge ("ALJ")
Sykle Merchan on July 24, 2014--the second Decision issued in this
matter.  (Doc.1; R. 1-5, 109-30.)  With this action, Plaintiff
identifies three errors: 1) the ALJ erred in finding that Plaintiff
"was able to 'communicate in English' without vocational limitation
and failing to include such limitations in the hypothetical
questions to the vocational expert"; 2) the ALJ erred in accepting
the vocational expert's testimony as consistent with the Dictionary
of Occupational Titles ("DOT") when two of the jobs identified had
greater demands than allowed by Plaintiff's RFC and all jobs
identified had greater language requirements than Plaintiff could
meet; and 3) the ALJ erred in not properly evaluating the testimony

of the medical expert witness who testified at the hearing and in accepting the hearing of the post-hearing consultative examiner. (Doc. 17 at 14-15.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

### A.   *Procedural Background*

Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on February 10, 2010. (Doc. 17 at 5.)  She alleged disability beginning on May 28, 2008. (R. 109.)  Following an initial denial on July 6, 2010, Plaintiff requested reconsideration which was also denied.  (Doc. 17 at 5.) Plaintiff then requested a hearing before an ALJ on September 10, 2010.  (*Id.*)  ALJ Allyn Brooks held a hearing on August 2, 2011, and issued his unfavorable decision on August 16, 2011.  (*Id.*) Plaintiff requested review by the Appeals Council, and the Appeals Council remanded the case for a new hearing with its November 14, 2012, Order.  (Doc. 17 at 6.)

On January 14, 2014, ALJ Merchan held another hearing.  (*Id.*) She issued the decision denying Plaintiff's claim on July 24, 2014, after concluding that Plaintiff was capable of performing jobs that existed in significant numbers in the national economy despite limitations related to her severe impairments of degenerative disc disease, cervical radiculopathy, major depressive disorder, panic

2

disorder, and disruptive mood dysregulation disorder.  (R. 112-30.)
The Appeals Council denied Plaintiff's request for review of the
hearing decision on April 11, 2016, making the ALJ's decision the
final decision of the Acting Commissioner.  (R. 1-5.)

As noted above, Plaintiff filed her action in this Court on
June 3, 2016.  (Doc. 1.)  Defendant filed her Answer and the
administrative transcript on August 8, 2016.  (Docs. 9, 10.)  After
Plaintiff filed her supporting brief (Doc. 17) on December 19,
2016, Defendant timely filed her opposing brief (Doc. 18), and
Plaintiff timely filed a reply brief (Doc. 19).  Therefore, this
matter is fully briefed and ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on May 3, 1973, and was thirty-six years
old on the date the application was filed and forty-one years old
at the time of the 2014 ALJ Decsion.  (R. 129; Doc. 18 at 4.)
Plaintiff, who came to the United States in 2006 as a refugee, said
that she had ten years of education in Uzbekistan "where the
education system only goes to 10 years."  (Doc. 17 at 7 & n.2; Doc.
18 at 4.)  Her interpreter at the second hearing interjected that
she had graduated and Plaintiff answered in the affirmative when
she was asked if she had finished high school.  (R. 18.)  Plaintiff
had past relevant work as a hand packager.  (R. 129.)  In her
brief, Defendant notes that

> [a]t two face-to-face disability interviews,
> Plaintiff spoke Russian and her son

> translated (Tr. 280, 327).  In a disability
> report, Plaintiff indicated that she could
> not speak and understand English, but could
> read and understand English, and could write
> more than her own name in English (Tr. 282).
> A provider at Swedish Covenant Hospital noted
> that "Patient does speak some English but her
> son translates as well" (Tr. 444).

(Doc. 18 at 4.)

## 1.   **Impairment Evidence**[1]

Plaintiff provides a brief summary of medical evidence which
we set out here to provide context.

> The plaintiff had a workplace injury at Tyson
> Foods and stopped working. [Tr. 433] Multiple
> MRIs showed cervical disc injury at C5-C[6].
> This problem appears to have got [sic] worse
> over time.  In addition, MRI of the lumbar-
> sacral area showed disk bulging at L4-L5 and
> disk herniation at L5-S1. [Tr. 490] Nerve
> conduction studies did not, however, confirm
> radiculopathy.  (See e.g. Tr. 409 *et seq.*)
> Treatment included spinal injections (see
> e.g. 435) and physical therapy (see e.g. Tr.
> 456).  There were notes of improvement in
> motion and pain (e.g. Tr. 458) as well as
> other notes of increase or recurrence in pain
> (see e.g. Tr. 483).

(Doc. 17 at 11-12 (footnotes omitted).)

Defendant provides a summary of evidence relevant to the
issues raised in Plaintiff's appeal.

> In April 2010, Plaintiff underwent a
> psychiatric consultative examination with Ana

---

[1] Both parties focus their medical evidence on that related to
Plaintiff's claimed errors: Plaintiff states that she does so
primarily in the Argument section of her brief (Doc. 17 at 6);
Defendant provides a Summary of Relevant Medical Evidence in the
Background section of her brief (Doc. 18 at 4-8 & n.1).

Gil, M.D. (Tr. 520-23).  Plaintiff spoke in
Russian and was accompanied by a translator
(Tr. 520).  Plaintiff reported social
isolation, decreased energy, irritability,
increased appetite, decreased sleep,
difficulty with concentration, poor memory,
lack of motivation, and crying spells;
however, Plaintiff never received psychiatric
treatment and had no history of suicidal
ideation, psychotic or manic symptoms (Tr.
520-21).  On mental status examination,
Plaintiff was cooperative; made good eye
contact; was alert and oriented in all
spheres; and was friendly, polite and related
well during the interview (Tr. 521).  She
noted feeling down and helpless, but denied
suicidal ideations, intent or plan, and she
presented with no auditory, visual or tactile
hallucinations, paranoid ideation or
delusions (Tr. 522).  Plaintiff could repeat
three digits forward and two in reverse, and
was able to name three objects immediately,
after one minute, three minutes, and five
minutes (Tr. 522).  She demonstrated the
capacity to classify and identify
similarities and differences, abstract, and
judgement was intact (Tr. 522-23).  Dr. Gil
diagnosed depressive disorder, NOS, moderate
in severity (Tr. 523).

Scott Kale, M.D., a medical expert and
internal medicine doctor, testified at the
second hearing after reviewing Plaintiff's
medical record (Tr. 38-42).  Dr. Kale
testified that Plaintiff's complaints of pain
had no physical basis, as there was no
evidence of radiculopathy, cervical
myelopathy, spinal stenosis, or significant
arthritis (Tr. 40).[2]  He noted that her pain
complaints were out of portion with physical
disease (Tr. 41).  On this basis, Dr. Kale
concluded that she equaled the mental listing

---

[2]  Following this testimony, Dr. Kale added that "the basis of
her complaints is consistent with soft tissue complaints of
myofascial pain, and also and more important, is consistent with
underlying depression more than any other condition."  (R. 40-41.)

for somatoform disorder,[3] Listing 12.07 (Tr. 41).

Dr. Kale noted that he has a master's degree in psychology, but does not practice it routinely (Tr. 41, 239).  He was not a psychiatrist, and was not board certified in psychiatry (Tr. 239-40).  Dr. Kale's curriculum vitae noted that he was an internist with specialization in arthritis and internal medicine (Tr. 239).  Dr. Kale admitted that there was no documented diagnosis of somatoform disorder in the record, and it was conclusory based on the lack of any other basis for her complaints (Tr. 41).  Plaintiff's attorney declined questioning Dr. Kale (Tr. 42).

After the hearing, on May 16, 2014, Plaintiff attended a consultative psychological examination with Charles LaJeunesse, Ph.D. (Tr. 622-28).  Plaintiff appeared with her son, who served as the translator (Tr. 623).  Plaintiff reported pain in her shoulders, neck and numbness around her arms and shoulders with lower back pain (Tr. 622).  She also endorsed depressive symptoms and anxiety (Tr. 622-23).  On mental status examination, Plaintiff was well-groomed; had normal posture; adequate manner of relating and social skills; and normal eye contact; but appeared somewhat restless (Tr. 623).  There were no signs of hallucinations, delusions or paranoia, and she reported no suicidal thoughts (Tr. 623-24).  Plaintiff's mood seemed dysthymic and her affect was somewhat dysphoric (Tr. 624).  Sensorium was clear (Tr. 624).  Attention was mildly impaired due to emotionality, and she could not do serial three subtraction without writing it down (Tr. 624).  Recent and remote memory skills were mildly impaired due to

_____

[3] Somatoform disorder is a mental illness that causes one or more bodily symptoms, including pain.  Somatic Symptom and Related Disorders.  WebMD, http://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment (last visited January 6, 2017).

anxiety; intellectual functioning was average; and general fund of information was somewhat limited (Tr. 624). Plaintiff reported performing self-care and chores with the support of her daughter (Tr. 624). Her son claimed that Plaintiff had no friends, but was part of a loving family (Tr. 624). Her only hobby was reading (Tr. 624). Dr. LaJeunesse diagnosed disruptive mood dysregulation disorder; major depressive disorder and panic disorder with a rule out diagnosis of social phobia (Tr. 625).

On May 21, 2010, state agency psychological consultant Howard Tin, Psy.D., reviewed the record and completed a Psychiatric Review Technique, and opined that Plaintiff did not have a severe mental impairment (Tr. 543-56).

(Doc. 18 at 5-8.)

## 2. **Hearing Testimony**

At the January 2014 hearing held in Evanston, Illinois, Plaintiff personally appeared as did her attorney, Richard Victor, Vocational Expert ("VE") Craig Johnston, interpreter Lydia Wexler; medical expert, Scott Kale, M.D., testified by phone.[4]   (R. 10.) Plaintiff testified that she lived in Scranton with her husband and three children who were twenty-three, twenty, and thirteen at the time.  (R. 17.)  She also said that before she started working she had taken English classes for "[n]o more than two months," she had taken her citizenship test in English two years before, and she had

---

[4]   Both hearings were held in Illinois where Plaintiff lived when she applied for benefits.  (R. 55.)  Shortly after the first hearing, Plaintiff moved to Pennsylvania and returned to Illinois for the second hearing.  (R. 15.)

become a citizen. (R. 18, 19.)

The ALJ asked Plaintiff if she could read and write in English and Plaintiff responded "no, not really." (R. 19.) Plaintiff confirmed that she could write her last name and address in English but she needed help to write a short note like a school absence excuse--her oldest son would help her and she would just sign her name. (R. 19-20.) She said she could read in English "[i]f it's a very, very simple word, the sentence" and her son helped her read things like the hearing notice. (R. 20.) Plaintiff testified that she had a driver's license and had taken the test in Russian. (R. 21.) When asked if she went to her youngest child's parent-teacher conferences to talk to his teachers, Plaintiff responded that she did not because she doesn't know the language so she feels uncomfortable. (R. 37.)

Regarding employment, Plaintiff said she last worked in 2008 at Tyson Foods as a meat packer--she worked for about a year before she was injured in a fall on the job and her doctors told here she could not work anymore. (R. 23-24.) Plaintiff's attorney clarified that a worker's compensation claim was filed--it was ultimately settled. (R. 25-26.) The ALJ asked Plaintiff how she communicated with her coworkers and supervisor when she worked at Tyson; Plaintiff said that she had some Russian-speaking coworkers who helped with communication with the supervisor so she spoke with him "through a translator." (R. 38.)

Following Dr. Kale's testimony outlined above, including his diagnosis of somatoform disorder, Plaintiff's attorney stated that he had no questions for Dr. Kale.  (R. 42.) VE Johnston then testified, indicating that his testimony would be consistent with the DOT or, if it was not consistent, he would advise the ALJ of that fact.  (R. 42-43.)  ALJ Merchan asked VE Johnston to consider an individual of Plaintiff's "age, education, and work experience who is able to do work at the sedentary exertional level, limited to no ladders, ropes, or scaffolds; no more than occasional as to the remaining postural activities of climbing ramps or stairs, balancing, stooping, crawling, crouching, or kneeling; no work above shoulder level; and no work in cold environments."  (R. 44.) The VE testified that Plaintiff's past work would not be available to such an individual but other jobs would be, including production assembler, parts inspector, and sorter.  (R. 45.)  The VE estimated that the number of jobs available would be reduced by fifty percent if the individual could not lift more than five pounds though this was not mentioned in the DOT.  (R. 45-46.)  The VE further testified that adding no more than frequent reaching, handling, or fingering would not affect the jobs because that was the typical requirement for the jobs, and adding additional restrictions of no more than simple, routine, repetitive tasks would not affect the jobs because he had cited only unskilled jobs.  (R. 46.)  VE Johnston stated that all jobs would be eliminated if the individual

9

were off work more than three days per month.  (*Id.*)

Plaintiff's attorney then questioned VE Johnston about a sit/stand option and the amount of time an individual would be expected to be on task.  (R. 47.)   The VE responded that the jobs would allow a sit/stand option and the individual would have to be on task at least eighty-five percent of the time.  (*Id.*) Plaintiff's attorney confirmed that he had no further questions. (*Id.*)

Before the hearing ended, ALJ Merchan determined that another consultative examination by a mental health professional was warranted because she had reservations about Dr. Kale's testimony-- he did not practice in the mental health area and there was no other mental health treatment.  (R. 47.)   Other than clarifying that Pennsylvania would be the best location for the consultative exam, Plaintiff's attorney had no further questions.  (R. 47-50.)

**3.   <u>ALJ Decision</u>**

In her July 24, 2014, Decision, ALJ Merchan made the following findings of fact and conclusions of law:

> 1.   The claimant has not engaged in substantial gainful activity since February 12, 2010, the application date (20 CFR 416.971 et seq.).
>
> 2.   The claimant has the following severe impairments: degenerative disc disease; cervical radiculopathy; major depressive disorder; panic disorder; disruptive mood dysregulation disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment
    or combination of impairments that meets
    or medically equals the severity of one
    of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1 (20 CFR
    416.920(d), 416.925 and 416.926).

4.  After careful consideration of the
    entire record, I find that the claimant
    has the residual functional capacity to
    perform sedentary work as defined in 20
    CFR 416.967(a) except the claimant
    cannot lift or carry more than five
    pounds, and is limited to occasional
    postural activities including balancing,
    stooping, kneeling, crouching, crawling
    and climbing ramps and stairs.  The
    claimant cannot climb ladders, ropes or
    scaffolds.  The claimant cannot do any
    work above shoulder level, or work in
    cold environments.  She may frequently,
    but not constantly use her bilateral
    arms for reaching, handling, and
    fingering.  She is restricted to simple,
    routine and repetitive work tasks.

5.  The claimant is unable to perform any
    past relevant work (20 CFR 416.965).

6.  The claimant was born on March 3, 1973,
    and was 36 years old, which is defined
    as a younger individual age 18-44, on
    the date the application was filed (20
    CFR 416.963).

7.  The claimant has at least a high school
    education and is able to communicate in
    English (20 CFR 416.964).

8.  Transferability of job skills is not an
    issue in this case because the
    claimant's past relevant work is
    unskilled (20 CFR 416.968).

9.  Considering the claimant's age,
    education, work experience, and residual
    functional capacity, there are jobs that
    exist in significant numbers in the

> national economy that the claimant can
> perform (20 CFR 416.969 and 416.969(a)).

> 10. The claimant has not been under a
> disability, as defined in the Social
> Security Act, since February 12, 2010,
> the date the application was filed (20
> CFR 416.920(g)).

(R. 112-130.)

Other relevant portions of the Decision will be discussed in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely

---

[5]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers

13

in the national economy.   (R. 129-30.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.   42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).   Substantial evidence means "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).   The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.   A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.   Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.   *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).   The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

14

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not

precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews*

16

*v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff argues that remand is required for the following reasons: 1) the ALJ erred in finding that Plaintiff "was able to 'communicate in English' without vocational limitation and failing to include such limitations in the hypothetical questions to the vocational expert"; 2) the ALJ erred in accepting the vocational expert's testimony as consistent with the Dictionary of Occupational Titles ("DOT") when two of the jobs identified had greater demands than allowed by Plaintiff's RFC and all jobs identified had greater language requirements than Plaintiff could meet; and 3) the ALJ erred in not properly evaluating the testimony of the medical expert witness who testified at the hearing and in accepting the hearing of the post-hearing consultative examiner. (Doc. 17 at 14-15.)

### A.   *Plaintiff's Language Abilities*

With Plaintiff's first two claimed errors, she argues that the ALJ did not properly assess her ability to communicate in English in several ways.  (Doc. 17 at 14-15.)  Defendant maintains that the ALJ did not err on the bases alleged.  (Doc. 18 at 11-23.)  The Court concludes that Plaintiff has not shown that remand is required on the bases argued in her briefs.

Relevant to Plaintiff's first argument that literacy in the English language is relevant to the ALJ's determination in this

case, she points to 20 C.F.R. § 416.964(b).[6]  (Doc. 17 at 17.)
Section 416.964 addresses "education as a vocational factor" and
explains how education is evaluated, noting that "[t]he term
education also includes how well you are able to communicate in
English since this ability is often acquired or improved by
education."  20 C.F.R. § 416.964(b).  The regulation then sets out
several educational designations, including the "[i]nability to
communicate in English":

> Since the inability to speak, read and
> understand English is generally learned or
> increased at school, we may consider this an
> educational factor.  Because English is the
> dominant language of the country, it may be
> difficult for someone who doesn't speak and
> understand English to do a job, regardless of
> the amount of education the person may have
> in another language.  Therefore, we consider
> a person's ability to communicate in English
> when we evaluate what work, if any, he or she
> can do.  It generally doesn't matter what
> other language the person may be fluent in.

20 C.F.R. § 416.964(b)(5).  Section 416.964(b)(6) addresses
"[i]nformation about education":

> We will ask you how long you attended school
> and whether you are able to speak,
> understand, read and write in English and do
> at least simple calculations in arithmetic.
> We will also consider other information about
> how much formal or informal education you may
> have had through your previous work,
> community projects, hobbies, and any other
> activities which might help you to work.

---

[6] Plaintiff mistakenly cites 20 C.F.R. § *9*16.964(b).  (Doc. 17
at 17 (emphasis added).)

18

20 C.F.R.  404.964(b)(6).

Here Plaintiff asserts the jobs identified by the VE have a General Education Development ("GED") level of 1 which Plaintiff does not meet and, therefore, specific vocational testimony was required.  (Doc. 17 at 24-26.)  In general, "GED measures those aspects of education (formal and informal) which are required of the worker for satisfactory job performance" and it is broken into three categories: reading development, mathematical development, and language development.  *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014) (internal quotation omitted).  Language Development is defined at Level 1 as follows:

> Reading: Recognize meaning of 2,500 (two—or three—syllable) words. Read at a rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names and addresses.
>
> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

DOT, Appendix, 1991 WL 688702 (G.P.O.).

SSR 00-4p addresses conflicts regarding occupational information provided by a VE and other vocational information.

> When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a

19

determination or decision about whether the
claimant is disabled.  At the hearings level,
as part of the adjudicator's duty to fully
develop the record, the adjudicator will
inquire, on the record, as to whether or not
there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2.  As explained in *Zirnsak*,

[a]s a general rule, occupational evidence
provided by a VE should be consistent with
the occupational evidence presented in the
DOT. [SSR 00-4p, 2000 WL 1898704] at *2.  To
ensure consistency, courts have imposed an
obligation on ALJ's to "[i]dentify and obtain
a reasonable explanation for any conflicts
between occupational evidence provided by
VE's...and information in the [DOT]."  *Id.* at
*1; *Rutherford* [*v. Barnhart*], 399 F.3d [546,]
556 [3d Cir. 2005].  Specifically, an ALJ is
required to (1) ask, on the record, whether
the VE's testimony is consistent with the
DOT, (2) "elicit a reasonable explanation"
where an inconsistency does appear, and (3)
explain in its decision "how the conflict was
resolved."  *Burns v. Barnhart*, 312 F.3d 113,
127 (3d Cir. 2002).  An ALJ's failure to
comply with these requirements may warrant
remand in a particular case.  *Rutherford*, 399
F.3d at 557.  However, this Circuit has
emphasized that the presence of
inconsistencies does not mandate remand, so
long as "substantial evidence exists in other
portions of the record that can form an
appropriate basis to support the result."
*Id.* (citing *Boone v. Barnhart*, 353 F.3d 203,
209 (3d Cir. 2004)).

777 F.3d at 617.

In *Zirnsak*, the Court found that the ALJ had specifically

asked about consistency between the VE's testimony and information

in the "DOT and other relevant vocational sources," the VE did not

note inconsistencies in GED reasoning level 3 and a limitation to

20

"simple and repetitive tasks involving routine work processes and settings" argued by the plaintiff on appeal, and "[i]mportantly, neither [the plaintiff] nor her attorney challenged the VE on these points or otherwise identified any apparent inconsistency between the VE's testimony and the DOT."  777 F.3d at 617.  The analysis continued:

> Because the VE did not identify the reasoning level inconsistency at the hearing, the ALJ did not elicit an explanation for that inconsistency or explain in its decision how the conflict was resolved.  *Burns*, 312 F.3d at 127.  Therefore, we must determine whether there is substantial evidence in the record that still supports the ALJ's determination.  *Boone*, 353 F.3d at 209.

777 F.3d at 617.

Assuming *arugendo* that Plaintiff's English language ability was a vocational factor at step 5 of the sequential evaluation process which was not directly addressed by the ALJ or VE and Plaintiff's English language abilities were less than those set out in GED language level 1, the question would remain whether the case must be remanded for further consideration of whether Plaintiff's English language ability would prevent her from doing the sorter job identified by the VE.[7]

---

[7]  Defendant persuasively argues that even if Plaintiff could not perform the production assembler and parts inspector positions based on conflicts with the manipulative limitations in the RFC, the sorter position identified by the VE remains and this job alone satisfies Defendant's burden at step five of showing that other work exists in significant number in the national economy.  (Doc. 18 at 18-19 (citing *Wright v. Sullivan*, 900 F.2d 675, 679 (3d Cir.

As noted above, Plaintiff argues that remand is required for specific evidence from a VE identifying jobs in the DOT for a person such as Plaintiff, with minimal English language skills, because all of the DOT jobs require at least a GED of 1.  (Doc. 17 at 25.)  This argument is based on the premise that the demands of GED language development level 1 "are far beyond the level of Plaintiff, no matter what was used to measure her ability to communicate in English."  (Doc. 19 at 7-8.)  Plaintiff further asserts that a VE's testimony that a particular job does not require the language skill specified by the DOT would be a variation from the DOT which the ALJ must weigh pursuant to SSR 00-4p.  (Doc. 17 at 25-26.)  The second aspect of Plaintiff's argument infers that there is *always* "an apparent unresolved conflict" for which an ALJ must *always* "elicit a reasonable explanation."  SSR 00-4p, 2000 WL 1898704, at *2.

Before proceeding with further discussion of Plaintiff's claimed error, the Court considers Defendant's assertion that Plaintiff's ability to communicate in English is irrelevant to the outcome of the case pursuant to Grid Rules pertaining to sedentary work (Doc. 18 at 15-16 & n.5).  Defendant relies on the following Grid Rule:

"While illiteracy or the inability to

---

1990)).)  Plaintiff does not refute this argument in her reply brief.  (*See* Doc. 19.)  Therefore, the Court limits the discussion to the sorter position identified by the VE.

22

> communicate in English may significantly
> limit an individual's vocational scope, the
> primary work functions in the bulk of
> unskilled work relate to working with things
> (rather than with data or people) and in
> these work functions at the unskilled level,
> literacy or ability to communicate in English
> has the least significance. . . . Thus, the
> functional capability for a full range of
> sedentary work, represents sufficient numbers
> of jobs to indicate substantial vocational
> scope for individuals age 18-44 even if they
> are illiterate or unable to communicate in
> English."

(Doc. 18 at 16 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, §
202.00(i)).)  The Court is not persuaded by Defendant's argument
that the language issue is irrelevant: the terms of the provision
itself apply to a "full range of sedentary work" which is not
consistent with Plaintiff's RFC (R. 44-46, 114-15); the ALJ did not
rely on the Grid Rules; and he is precluded from doing so pursuant
to *Sykes v. Apfel*, 228 F.3d 259, 266-71 (3d Cir. 2000), because
Plaintiff has both exertional and nonexertional impairments and
limitations.

Defendant also asserts that Plaintiff's argument that the job
of sorter was inconsistent with her alleged inability to speak
English is without merit in part because "GED levels are merely
advisory in nature and serve only as a reference for the ALJ and
VE."  (Doc. 18 at 20.)  Based on *Zirnsak's* analysis of the claimed
step five error regarding a GED level, 777 F.3d at 617-19, the
Court cannot conclude that GED considerations are categorically
insignificant when analyzing an ALJ's reliance on a VE's testimony.

23

The Court concludes that, rather than the bright-line rule suggested by Plaintiff, the *Zirnsak* case-specific approach (following cases which "focused on whether a failure to inquire about or reconcile a conflict caused any harm to the claimant when determining whether remand is necessary," 777 F.3d at 618) is appropriate here and is consistent with the emphasis in this Circuit that the presence of inconsistencies does not mandate remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result."  777 *F.3d at 617* (quoting *Rutherford*, 399 F.3d at 557).[8]

Here the ALJ recognized the "general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT,"  777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2), inquiring of the VE

---

[8] Although Plaintiff asserts that the ALJ erred in failing to include language limitations in her hypothetical questions to the VE, Plaintiff does not adequately develop this issue and supports the statement that "[i]f the plaintiff has a limited ability to use English then it must be included in the hypothetical question asked the vocational expert" with a single citation.  (Doc. 17 at 18 (citing *Zapata-Alvarez v. Colvin*, Civ. A. No. 14-2830, 2015 WL 5179477 (E.D. Pa. Sept. 4, 2015)).)  With this lack of development, the Court does not further address thr matter except to note that *Zapata-Alvarez* decided to remand the case on the basis asserted without reference to the relevant authority relied upon here and cited only *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1987), for the proposition that "[a]n ALJ may consider the testimony of a vocational expert in response to a hypothetical question only if the question accurately portrays the claimant's physical and mental limitations," 2015 WL 517, 9477, at *9--a questionable proposition where the limitation at issue is language rather than "physical or mental."

about the consistency between his testimony and the DOT.  (R. 43.)
The VE responded affirmatively and the ALJ did not ask about the
inconsistency regarding language level now alleged.  Although
Plaintiff's attorney was given a specific opportunity to question
the VE and raised questions about hypotheticals posed by the ALJ
and positions identified by the VE (R. 47), neither Plaintiff nor
her attorney challenged the VE or the ALJ about any language-
related matters, and Plaintiff's attorney did not seek to elicit
information about Plaintiff's language abilities beyond questions
asked by the ALJ.  (R. 18-20.)

Looking now to more specific factors addressed in *Zirnsak*, we
first consider whether Plaintiff "seriously argue[s] that she is
incapable of performing the jobs . . . recommended by the VE."  777
F.3d at 619.  Plaintiff does not argue that she is incapable of
performing the sorter job identified by the VE.  In her reply brief
she notes that "[i]t may be that a VE, if asked, would provide
reasons why the plaintiff could do some or all of the jobs cited
even with a lower then [sic] GED 1 level."  (Doc. 19 at 9.)
Plaintiff does not follow this observation with any assertion that
such testimony would or could be substantively refuted, but states
only that this is an administrative matter.  (*Id.* at 9-10.)

Beyond the lack of evidence and lack of assertion to the
contrary, the record supports that Plaintiff had sufficient
language skills to perform the position.  A fair inference can be

25

drawn from the hearing testimony that the VE took Plaintiff's English language ability into account when he provided exemplary position recommendations: the VE confirmed that he had heard the testimony presented at the hearing, he was familiar with the vocational terms and definitions in the regulations, and he was familiar with the jobs existing in the region and the national economy (R. 43); the regulations specify that the term "education" includes how well the claimant is able to communicate in English, and the claimant's ability to communicate in English is considered when it is evaluated what work a claimant can do, 20 C.F.R. § 416.964(b), (b)(5); with each hypothetical question from the ALJ, VE Johnston was asked to consider a person of Plaintiff's "age, education, and work experience" (R. 44-46).  Thus, when deciding what work Plaintiff could do (including the exemplary sorter position), the VE would have considered Plaintiff's ability to communicate in English including the use of an interpreter at the hearing (*see* R. 10), Plaintiff's testimony about her English language abilities and difficulties (R. 18-20), the fact that her ten years of formal education (high school) had been in Uzbekistan (R. 18), and the fact that she had only two months of formal English classes when she arrived in the United States (R. 19). Because the ALJ made no findings at the hearing regarding Plaintiff's ability to communicate in English and nothing in the hypotheticals altered the broad application of the general

26

regulatory framework with which the VE expressed familiarity, the VE's testimony that Plaintiff had the ability to perform the sorter position was not influenced by the ALJ's later conclusions in her Decision that Plaintiff "seems to be literate in the English language" (R. 110), and "is able to communicate in English" (R. 129).  Another aspect of the record that supports the conclusion that Plaintiff could perform the sorter position is Plaintiff's testimony that she took the citizenship exam in English and "studied well" to do so (R. 18).  Though Plaintiff highlights the limited vocabulary associated with the exam (Doc. 18 at 20-21), the testimony is significant beyond the accomplishment--an ability to learn task-specific language shows a practical ability to apply language skills and intelligence in a specific context such as the sorter position.  Medical record notations that Plaintiff "does speak some English" (R. 444) is further evidence supporting an ability to perform the sorter position.

The second factor considered in *Zirnsak* was wether the plaintiff's counsel had identified any inconsistencies at the hearing.  777 F.3d at 619.  As discussed above, Plaintiff's counsel did not identify any inconsistencies regarding language ability or raise the matter inferentially.

The final *Zirnsak* factor was whether the jobs identified by the VE were exemplary.  *Id.*  VE Johnston identified the positions as "examples of occupations that would be available."  (R. 44.)

The foregoing analysis indicates that the facts of this case (considered in the context of relevant caselaw and regulations) warrant the conclusion that substantial evidence exists in the record to support the ALJ's conclusion that Plaintiff could perform the sorter position and Plaintiff was not harmed by the ALJ's failure to address the alleged inconsistency at the hearing. Therefore, remand for reconsideration of this issue is not required. *See*, *e.g.*, *Rutherford*, 399 F.3d at 557.

**B. Medical Expert Opinion**

Plaintiff also asserts that remand is warranted because the ALJ erred in her evaluation of the opinion of Dr. Kale, a testifying medical expert, that Plaintiff suffered from somatoform disorder and in accepting the opinion of Dr. LaJeunesse, a consultative examiner, who did not diagnose the disorder. (Doc. 17 at 26.) Defendant responds that substantial evidence supports the ALJ's evaluation of these opinions. (Doc. 18 at 23.) The Court concludes Plaintiff has not shown remand is warranted on the basis alleged.

In general, greater deference is due an examining source than a non-examining source. 20 C.F.R. § 416.927(c)(1). Section 416.927(c)(3) provides the following:

> The more a medical source presents relevant
> evidence to support an opinion, particularly
> medical signs and laboratory findings, the
> more weight we will give that opinion. The
> better an explanation a source provides for
> an opinion, the more weight we will give that

28

> opinion. Furthermore, because nonexamining
> sources have no examining or treating
> relationship with you, the weight we will
> give their opinions will depend on the degree
> to which they provide supporting explanations
> for their opinions. We will evaluate the
> degree to which these opinions consider all
> of the pertinent evidence in your claim,
> including opinions of treating and other
> examining sources.

*Id.*

ALJ Merchan analyzed the relevant portion of Dr. Kale's

hearing testimony as follows:

> At the end of his testimony Dr. Kale
> added, that the claimant has depression, and
> given her disproportionate pain reports, as
> compared to her physical impairments, he
> opined that the claimant's depression equaled
> the requirements of listing 12.07 concerning
> somatoform disorder.  Dr. Kale went on to
> report that he has an advanced degree in
> psychology, but does not practice it
> routinely (Exhibit 19B).  Despite his
> expertise on the subject, I could not give
> any significant weight to this conclusion as
> the record included no documentation of
> diagnosis of a somatoform disorder, or
> somatoform depression, to indicate even a
> medically determinable impairment.  Giving
> credit to Dr. Kale's testimony however, after
> the hearing, I sent the claimant for a
> psychological consultative examination to
> further develop this potential theory.
> Although psychologist Dr. Charles LaJeunesse,
> Ph.D. acknowledged the claimant's reports of
> pain in the examination, May 6, 2014, he
> notably did not diagnose a somatoform
> disorder (Exhibit 16F).  Consequently, I
> cannot give weight to this portion of Dr.
> Kale's testimony.

(R. 114.)  This summary indicates that ALJ Merchan did not give

weight to Dr. Kale's somatoform disorder diagnosis for two specific

reasons: because "the record included no documentation of diagnosis of a somatoform disorder, or somatoform depression, to indicate even a medically determinable impairment" and Dr. LaJeunesse did not diagnose a somatoform disorder.  (R. 114.)

Plaintiff's argument on this issue clearly shows that she is displeased with ALJ Merchan's analysis, but she does not support her argument with any citation to authority aside from the proposition that "some mental health condition may be diagnosed by a doctor who is not a specialist in mental health, but in another specialty[.]" (Doc. 17 at 31 & n. 21 (citing *Cramer v. Colvin*, Civ. A. No. 3:13-CV-2665, 2014 WL 6982672 (M.D. Pa. Dec. 10, 2014); *Heinz v. Heckler*, 581 F. Supp. 13 (E.D. Pa. 1983); *Sprague v. Bowen*, 812 F.2d 1226 (9th Cir. 1987)).)   Following this averment, Plaintiff asserts that "a diagnosis of somatoform disorder should be made by someone who either has the qualifications to diagnose both physical and mental health problems, such as Dr. Kale, or a mental health professional who has, at the very least, been asked to assume that the patient does not have physical conditions that would account for her pain."[9]   (Doc. 17 at 31.)   This conclusory

---

[9]   Interestingly, Plaintiff takes issue with Dr. Kale's assessment of Plaintiff's physical impairments: "Dr. Kale testified that there was no basis for the plaintiff's physical complaints. This ignores the MRI's that show disc herniations.  He relied, it appears, on the back [sic] of positive electrodoagnostic [sic] tests.  He was not asked about the well known level of false negatives in such studies."  (Doc. 17 at 27.)  Plaintiff's observations regarding problems with Dr. Kale's evaluation of the evidence supporting complaints of pain inferentially undermines

statement and others like it do not come close to satisfying Plaintiff's burden to show the ALJ erred on the basis alleged.

Plaintiff does not attempt to specifically show how ALJ Merchan ran afoul of the regulatory provision cited above. Plaintiff cannot show that Dr. Kale's opinion is entitled to greater deference than that of the consultative examiner because Dr. Kale did not examine the patient and based his opinion on his review of medical evidence.  Plaintiff cannot show that his opinion is entitled to greater deference on the basis of supporting evidence because there is none in the record and the only reason he provides for the diagnosis is that Plaintiff's complaints of pain were out of proportion with identified abnormalities.  (R. 41.) Interestingly, although Plaintiff urges reliance on Dr. Kale's opinion regarding somatoform disorder, she takes issue with his assessment of Plaintiff's physical impairments: "Dr. Kale testified that there was no basis for the plaintiff's physical complaints. This ignores the MRI's that show disc herniations.  He relied, it appears, on the back [sic] of positive electrodoagnostic [sic] tests.  He was not asked about the well known level of false negatives in such studies."  (Doc. 17 at 27.)  Plaintiff's comments regarding problems with Dr. Kale's evaluation of the evidence

reliance on his somatoform disorder diagnosis – if Plaintiff's physical complaints were attributed to diagnosed conditions, i.e, found to be better supported, Dr. Kale's reliance on lack of support for physical complaints as the basis for the somatoform diagnosis would be undermined or invalidated.

supporting complaints of pain inferentially undermines reliance on his somatoform disorder diagnosis – if Plaintiff's physical complaints were attributed to diagnosed conditions, i.e, found to be better supported, Dr. Kale's reliance on lack of support for physical complaints as the basis for the somatoform diagnosis would be undermined or invalidated.

   With no evidence in the record of somatoform disorder aside from a testifying, non-examining source, and no diagnosis of such a condition from any of Plaintiff's treating or examining sources, the Court cannot conclude that ALJ Merchan erred on the basis alleged.

### V. Conclusion

   For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: February 15, 2017